# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANGELA R. STINES,                    :
                                     :
                  Plaintiff          :
                                     :          3:13-CV-02172
          vs.                        :
                                     :          (Judge MARIANI)
CAROLYN W. COLVIN, ACTING            :
COMMISSIONER OF SOCIAL               :
SECURITY,                            :
                                     :
                  Defendant          :

FILED
SCRANTON

AUG 2 8 2014

PER _____
        DEPUTY CLERK

## MEMORANDUM

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Angela R. Stines's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Stines met the insured status requirements of the Social Security Act through December 31, 2010. Tr. 10, 12, 104 and 153.[1] In order to establish entitlement to disability insurance benefits Stines was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

---

1.    References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on November 20, 2013.

Stines filed five prior applications for disability insurance benefits. Tr. 108-109.  Four of those application were denied at the initial administrative level and one after a hearing before an administrative law judge. Id.  With respect to those prior cases Stines did not seek any further administrative or court review. Id.  The most recent denial without any further administrative or court review occurred on February 6, 2009. Tr. 123.

Stines  protectively filed[2] her present application for disability insurance benefits on April 3, 2010. Tr. 82, 102-103, 120 and 122.  Stines claimed she became disabled on July 31, 2009.  Tr. 32.  Consequently, the relevant time period in reviewing the present case is July 31, 2009,  through December 31, 2010, Stines's date last insured.

Stines's application was initially denied by the Bureau of Disability Determination[3] on December 27, 2010. Tr. 10 and 85-89.  On December 30, 2010, Stines requested a hearing before an administrative law judge. Tr. 10 and 90-91.  After about 12 months had passed, a hearing was held on December 14, 2011, before an administrative law judge. Tr. 10 and 26-63.  Stines was represented by counsel at the hearing. Id.  On February 14, 2012, the administrative law judge issued a decision denying Stines's application Tr. 22-34.  As will be explained in more detail *infra* the administrative law judge found that Stines failed to prove that she met the requirements of a listed impairment or suffered from work-preclusive functional limitations. Tr. 14-16.  The administrative law judge concluded that Stines had the ability to engage in a limited

---

2.    Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3.    The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.  Tr. 86.

range of unskilled, light work which was treated as sedentary by a vocational expert who testified at the administrative hearing.[4] Tr. 16.  On March 5, 2012, Stines filed a request for review with the Appeals Council and after over 15 months had elapsed the Appeals Council on June 21, 2013, concluded that there was no basis upon which to grant Stines's request for review. Tr. 1-6.

---

4.    The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.*  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.*  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

> (d) *Heavy work.*  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

> (e) *Very heavy work.*  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. §§ 404.1567 and 416.967.

3

Stines then filed a complaint in this court on August 16, 2013.  Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on February 3, 2014, when Stines elected not to file a reply brief.

Stines was born in the United States on September 12, 1974, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1516(c). Tr.  82, 102, 106 and 120.

Stines graduated from high school in 1992 and can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr.  34, 125, 127, 140 and 930.  During her elementary and secondary schooling, Stines attended regular education classes. Tr. 127.  After graduating from high school, Stines served in the United States Air Force from July, 1995 to January, 1997. Tr. 480. While in the Air Force Stines worked in the electronics field. Tr. 930.  Stines received a maternity discharge. Id.  Stines in June, 2005, completed two years of college but did not receive a degree. Tr. 127.  Stines reported that she did not complete "any type of specialized job training, trade or vocational school" although one medical record notes that she "went to Beautician school." Tr. 127 and 930.

Stines's  work history covers 18 years and at least 12 different employers, including the United States Air Force. Tr.  105 and 112-115.  She also was self-employed

---

5.    Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

6.    The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Stines was 37 years old.

as a tattoo artist in 2007 and 2009. Tr. 37, 116, 145 and 147.   In 2008, she worked for C3I, Inc., a computer technical support company. Tr. 34 and 116.  The records of the Social Security Administration reveal that Stines had earnings in the years 1988  through 2002 and 2007 through 2009 as follows:

| | |
|---|---:|
| 1988 | $     205.65 |
| 1989 | 1206.36 |
| 1990 | 2550.47 |
| 1991 | 3208.05 |
| 1992 | 5304.20 |
| 1993 | 2031.06 |
| 1994 | 539.37 |
| 1995 | 7883.98 |
| 1996 | 12780.95 |
| 1997 | 781.06 |
| 1998 | 9907.23 |
| 1999 | 7908.60 |
| 2000 | 12709.78 |
| 2001 | 27909.90 |
| 2002 | 5149.28 |
| 2007 | 12059.75 |
| 2008 | 9620.38 |
| 2009 | 14172.00 |

Tr.  105.   Stines's total earnings during those 18 years were $135,928.08. Id.

        Stines in a document filed with the Social Security Administration stated that she worked from January, 2008, to May, 2008, 8 hours per day, 5 days per week at a help desk of a computer technical support company. Tr. 145-146.  Stines reported that she would answer phone calls and walk customers through technical problems with their computers. Tr. 146. Stines also reported that from January, 2009 to July, 2009, she worked 8 hours per day, 5 days per week as a tattoo artist. Tr. 145 and 147. She also worked as a "crew chief" for the United States Census in 1998 and 1999; as a customer service supervisor for a company operating home security systems in 1999; and as an

5

operations manager at a rental car company in 2000, 2001 and 2002. Tr. 35-37 and 114-115.

Stines has past relevant employment[7] as  (1) a help desk clerk which was described as skilled, sedentary work by a vocational expert; (2) a tattoo artist described as skilled, sedentary work; (3)  an office manager described as skilled, light work; (4) as a records keeper described as semi-skilled, light  work; (5) a crew chief described as skilled, light work; and (5) a customer service person described as skilled, sedentary work. Tr. 55-56.

Stines claims that she became disabled on July 31, 2009, because of bipolar disorder, severe depression, social anxiety disorder, fibromyalgia and hypothyroidism. Tr. 85 and 126; Doc. 11, Plaintiff's Brief, p. 1.  Although Stines in a document filed with the Social Security Administration stated that she stopped working on July 31, 2009, medical records indicate that she worked as a tattoo artist in 2010. Tr. 38. Stines testified at the administrative hearing that she worked "intermittently" in 2010. Id.

As noted above the relevant time period for determining whether Stines suffered a work-preclusive disability is July 31, 2009, the alleged disability onset date through December 31, 2010, her date last insured.  For the reasons set forth below we will affirm the decision of the Commissioner denying Stines's application for disability insurance benefits.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec.

---

7.    Past relevant employment in the present case means work performed by Stines during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability

insurance and supplemental security income claims.  See 20 C.F.R. §404.1520; Poulos,

474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment

that is severe or a combination of impairments that is severe,[9] (3) has an impairment or

---

8.    If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

9.    The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An
(continued...)

combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Stines's medical records.  Stines primary

---

9.   (...continued)
individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).


10.   If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11.   If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

treatment facility was the VA Medical Center in Wilkes-Barre.   In reviewing those records, one thing which becomes clear is that Stines has a long history of substance abuse and dependence, including opioid abuse.  Tr. 176-180 and 193.  We will primarily focus on medical records of treatment received by Stines on and after the disability onset date of July 31, 2009, and on or before December 31, 2010, the date last insured, and those records which Stines commented on in her brief.[12] We will, however, start with some records that predate July 31, 2009.

   Stines successfully underwent treatment for cervical cancer and began reporting back pain apparently caused by a fall at work or a whiplash injury in 2001 or 2003.[13] Tr. 193, 323, 382,1104 and 1578.   Sometime in 2004 Stines commenced reporting widespread muscle pain and was diagnosed with fibromyalgia.[14] Tr. 1578. Stines underwent treatment and intermittently reported improvements in her symptoms. Tr. 199 and 369.

---

12. Stines's brief is five pages in length and her summary of the relevant medical evidence consists of 2 paragraphs.

13. One medical record was dated October 3, 2008 and noted that Stines suffered a "whiplash injury and fall about five years ago" which would have been in 2003. Tr. 193.

14. "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." Fibromyalgia, Definition, Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/fibromyalgia /basics/definition/con-20019243 (Last accessed August 27, 2014).  At one point fibromyalgia was only diagnosed if a patient had 11 out of 18 positive tender points. Presently, a diagnosis can be made if a patient has widespread pain for more than 3 months with no underlying medical condition that could cause the pain.  There is no blood test or objective criteria for such a diagnosis to be made.  However, some physician still rely on the tender point examination and attempt to rule out other possible causes, including rheumatological and autoimune disorders. Fibromyalgia, Tests and diagnosis,  Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/ fibromyalgia/basics/tests-diagnosis/con-20019243 (Last accessed August 27, 2014).

On June 13, 2008, Stines had an appointment at the VA Medical Center for "medication management and supportive therapy." Tr. 364.  Stines complained of mood swings, violent behavior towards her boyfriend, and anxiety with obsessive compulsive symptoms. Id.  The examining medical provider found that she was alert and oriented to person, place and time; she was cooperative, calm and pleasant; she was fairly well groomed and appropriately dressed; she exhibited a nervous mood; her affect was appropriate; she had no psychomotor agitation or retardation; her speech was spontaneous, relevant and coherent; her thought processes were organized and logical; she had no auditory or visual hallucinations; she denied suicidal or homicidal thoughts; her memory both recent and remote was intact; and she had fair insight and judgment. The only adverse mental status findings were that she described her mood as "nervous" and admitted she had  some paranoid thoughts. Id.

At an appointment on October 3, 2008, with a VA Medical Center social worker, Stines noted that she never received inpatient treatment in connection with her mental impairment. Tr. 358.  It was observed that Stines could benefit from out-patient services "if she could maintain consistency." Id.   A mental status examination revealed that Stines was alert and oriented to person, place and time; her speech was spontaneous, relevant and coherent; her mood was depressed; she was mildly anxious but not agitated; her memory was not impaired; she had no psychomotor retardation, suicidal or homicidal thoughts, delusions, or hallucinations; and her insight and motivation were limited. Tr. 353.   At a physical examination on October 3rd Stines denied "any acute complaints[.]" Tr. 345.  The results of the physical examination were essentially normal. TR. 346.  It was noted that Stines's fibromyalgia was stable and she

12

was continued on pain medications, including pregabalin,[15] tramadol,[16] and cyclobenzaprine.[17] Tr. 345.

On May 29, 2009, Stines had an appointment with an addiction therapist at the VA Medical Center. Tr. 272-275. During that appointment Stines stated that over the past month she received $832 in unemployment compensation and that two people were dependent on her for support. Tr. 273.  It was noted that Stines was "on unemployment but [had] filed for disability due to mental/physical health is[s]ues."[18] Id.  Stines further admitted using cocaine on one occasion during the past month and that she had a 13 year history of cocaine and marijuana use. Id.  The record of this appointment notes that Stines had a criminal charge of forgery of a prescription for a controlled substance pending. Tr. 274.  With respect to that charge Stines was subsequently sentenced to an 18-month term of probation. Tr. 1104.

---

15.    Pregabalin (brand name Lyrica) "is an anti-epileptic drug, also called an anticonvulsant . . . used to control seizures and to treat fibromyalgia. It is also used to treat pain caused by nerve damage in people with diabetes (diabetic neuropathy), herpes zoster (post-herpetic neuropathy), or spinal cord injury." Pregabalin, Drugs.com, http://www.drugs.com/mtm/pregabalin.html (Last accessed August 27, 2014).

16.    Tramadol (brand name Ultram) "is a narcotic-like pain reliever . . . used to treat moderate to severe pain." Tramadol, Drugs.com, http://www.drugs.com/tramadol.html (Last accessed August 27, 2014).

17.    Cyclobenzaprine (brand name Flexeril) is a muscle relaxant.  Cyclobenzaprine, Drugs.com, http://www.drugs.com/cyclobenzaprine.html (Last accessed August 27, 2014).

18.    An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). Although receipt of workers' compensation benefits does not preclude an award of DIB, an adminsitrative law judge may consider receipt of such benefits when judging a claimant's credibility.

13

On June 17, 2009, shortly before the alleged disability onset date of July 31, 2009, Stines was found alert and oriented to person, place and time, with a depressed and stressed mood, but organized and logical thought processes, intact memory, no psychomotor agitation or retardation, fair judgment and insight, and no suicidal or homicidal thoughts. Tr. 268.  She was diagnosed as suffering from bipolar disorder and substance abuse in remission. Id.

A review of the records that predate July 31, 2009, does not reveal any detailed assessment from a treating physician indicating that Stines had work-related mental or physical functional limitations.  Stines in her brief merely argued that the medical records revealed that Stines was "treated for fibromyalgia with the following functional limitations for daily activities in chores, shopping, exercising, sports, recreation, traveling, bathing and driving." Doc. 11, Plaintiff's Brief, p. 3.  However, the portion of the record quoted by Stines does not support the conclusion that she is totally disabled.  In fact it appears to be merely a summary of Stines's problems, diagnosis and functional effects by a certified registered nurse practitioner well prior to the alleged disability onset date with no reference to objective examination findings.  Tr. 342-346.  This summary also appears to be related to an attempt by Stines to obtain a military service connected disability rating. Tr. 342-346.  The consultative report dated October 17, 2008,  with respect to this attempt by Stines states that no service connected disabilities were found. Tr. 344.

After the alleged disability onset date Stines does not point to an opinion from a treating physician indicating that she is disabled from a mental or physical

14

standpoint for the requisite continuous 12-month period.[19]  She merely states that she

was diagnosed with mild depression in November 2007 which blossomed into "a

worsening condition of bipolar disorder." Doc. 11, Plaintiff's Brief, p. 3.  She then notes

that there was a psychological consultation on December 15, 2010, which indicated that

she suffered "from [posttraumatic stress disorder], bipolar disorder [] and opioid

dependency in full remission with a [Global Assessment of Functioning ] GAF [score] of

50[20] with poor concentration, poor short term memory, poor impulse control and judgment

with additional chronic pain from fibromyalgia." Id.  This one-time  consultation 16 days

---

19.    To receive disability benefits, the plaintiff must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not less than 12 months."
42 U.S.C. § 432(d)(1)(A).

20.    The GAF score allows a clinician to indicate his judgment of a person's overall
psychological, social and occupational functioning, in order to assess the person's
mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th
ed. 1994). A GAF score is set within a particular range if either the symptom severity or
the level of functioning falls within that range. Id. The score is useful in planning
treatment and predicting outcomes. Id.  The GAF rating is the single value that best
reflects the individual's overall functioning at the time of examination.  The rating,
however, has two components: (1) symptom severity and (2) social and occupational
functioning.  The GAF is within a particular range if either the symptom severity or the
social and occupational level of functioning falls within that range.  When the
individual's symptom severity and functioning level are discordant, the GAF rating
reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would
have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably
influenced by delusions or hallucinations or serious impairment in communication or
judgment or inability to function in almost all areas.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major impairment in several
areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF
score of 41-50 indicates serious symptoms or any serious impairment in social,
occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate
symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A
GAF score of 61 to 70 represents some mild symptoms or some difficulty in social,
occupational, or school functioning, but generally functioning pretty well with some
meaningful interpersonal relationships. Id.

before her date last insured was performed by Tiffany Griffiths, Psy.D., a psychologist, on behalf of the Bureau of Disability Determination. After conducting a clinical interview and a mental status examination, Dr. Griffiths concluded that Stines suffered from posttraumatic stress disorder, bipolar disorder, opioid dependence in full-sustained remission and as stated above she gave Stines a GAF score of 50. Tr. 1106. However, Dr. Griffiths further noted that Stines's functioning with respect to daily activities was adequate; she had moderate difficulty with social functioning; her concentration was poor; and she was a "responsible individual and [could] manage her own finances as well as her basic daily living needs." Id. Dr. Griffiths noted that Stines was in treatment and she continued to have marked symptoms at times but her mood was "pretty stable" and she was only "experiencing moderate difficulties." Id. Dr. Griffiths completed a separate statement of Stines's ability to perform mental work-related activities. Tr. 1108-1110. In that document Dr. Griffiths found that Stines only had marked[21] difficulties with respect to responding appropriately to work pressures in a usual work setting.[22] Tr. 1109. With respect to the other mental work-related abilities, Dr. Griffith opined that Stines only had slight[23] or moderate[24] difficulties. Tr. 1109-1110.

---

21.    "Marked" was defined in the document as "[t]he ability to function is severely limited but not precluded." Tr. 1108.

22.    As will be elaborated on *infra* the administrative law judge found that Stines could only work in a low stress environment.

23.    "Slight" was defined as "the individual can generally function well." Tr. 1108.

24.    "Moderate" was defined as "[t]here is moderate limitation . . . but the individual is still able to function satisfactorily." Id.

16

Stines also states that a consultative examination of September 29, 2010, confirmed a VA Medical Center report that Stines suffered from uncontrolled seizures by history,[25] hypothyroidism and chronic pain syndrome. Doc. 11, Plaintiff's Brief, p. 3. That consultative examination was performed by Vincent Bianca, M.D., on behalf of the Bureau of Disability Determination. Dr. Bianca after conducting a clinical interview and a physical examination concluded that Stines suffered from bipolar and paranoid disorder with depression and anxiety; uncontrolled seizures, by history; hypothyroidism; and fibromyalgia and chronic pain syndrome by history. Tr. 1093.  Dr. Bianca noted that "[p]hysically [Stines was] an alert and oriented female" but it was "difficult to get a cohesive history out of [her] because of rambling from one set of symptoms to another" and that Stines "basically [] states she has total body pain and has difficulty performing any tasks." Tr. 1092.  The results of a physical examination were essentially normal other than slightly elevated blood pressure, subjective complaints of pain on palpation of her entire body from the neck down, and obvious obesity. Id.  Stines had no focal neurological deficits; her cranial nerves were intact; her reflexes and muscle strength in the upper and lower extremities were normal; and her gait and station were normal. Id.

On November 4, 2010, Theodore C. Waldron, M.D., reviewed Stines's medical records on behalf of the Bureau of Disability Determinations and concluded that Stines could occasionally lift 20 pounds; she could frequently lift 10 pounds; she could stand and/or walk 4 hours in an 8-hour workday; she could sit about 6 hours in an 8-hour

---

25.    The use of the qualifying language "by history" means that the assessment was based on what Stines reported or what was reported in the medical records. It also can have the connotation that the examining physician no longer believes that the patient suffers from that condition.  It is not clear what meaning was intended.

workday; she had unlimited ability to push and pull except the weight had to be limited to the amounts for lifting and carrying; she could occasionally crawl and use ramps and climb stairs but never climb ladders, ropes or scaffolds; she could frequently balance, stoop, kneel and crouch; she had no manipulative limitations such as reaching, handling, fingering, and feeling; she had no visual limitations; she had no communicative limitations, including hearing; and she had to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, environmental irritants, such as fumes, and hazards, such as moving machinery.[26] Tr. 1096-1099.

On December 23, 2010, John N. Grutkowski, Ph.D., a psychologist, reviewed Stines medical records on behalf of the Bureau of Disability Determination and concluded that Stines suffered from severe affective, anxiety-related and substance addiction disorders but that those disorders did not meet or equal the requirements of a listed impairment. Tr. 1113-1125. Dr. Griffiths further found Stines was moderately limited in only three work-related mental functional abilities: (1) the ability to work in coordination with or proximity to others without being distracted by them; (2) the ability to interact appropriately with the general public; and (3) the ability to respond appropriately to changes in the work setting. Tr. 1126-1127. Dr. Griffiths concluded that Stines "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments."[27] Tr. 1128.

---

26.    Also, on January 30, 2009, Anne C. Zayden, M.D., a state agency physician after reviewing Stines's medical records concluded that Stines had the ability to engage in a limited range of medium work. Tr. 1233-1239.

27.    Also, in January, 2009, Ali Nourian, M.D., a state agency physician, found that Stines had no limitations in three areas of work-related mental functioning, slight
(continued...)

No treating physician provided a functional assessment indicating that Stines  was disabled from a physical or mental standpoint.

**Discussion**

The administrative law judge at step one of the sequential evaluation process found that Stines had not engaged in substantial gainful work activity during the relevant time period, i.e., July 31, 2009 through December 31, 2010. Tr. 12.

At step two of the sequential evaluation process, the administrative law judge found that Stines had the following severe impairments: "fibromyalgia, cervicalgia,[28] depression, bipolar disorder, panic disorder, post traumatic stress disorder (PTSD), chronic obstructive pulmonary disease (COPD), asthma, obesity, hearing loss, migraines and since August 2010, seizures[.]" Tr. 12-13.

At step three of the sequential evaluation process the administrative law judge found that Stines's impairments did not individually or in combination meet or equal a listed impairment. Tr.  25-27.

---

27.    (...continued)
limitations in three areas, moderate limitations in three areas and marked limitations in one area. Tr. 1232.  The one area where Stines had marked limitations was in her ability to carry out detailed instructions. Id.  As will be explained *infra* Stines was limited by the ALJ to simple, unskilled work.  Furthermore, a state agency psychologist, Dennis C. Gold, Ph.D., in January, 2009, found that Stines's impairments did not meet or equal a listed impairment and that she was only moderately limited in three areas of work-related mental functioning. Tr. 1240-1257.  Dr. Gold further found that Stines was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." Tr. 1242.

28.    Cervicalgia is neck pain which does not radiate outward to the arms, i.e., localized neck pain. Cervicalgia, MedConditions.net, Dictionary of medical conditions terminology, http://medconditions.net/cervicalgia.html (Last accessed August 27, 2014).

At step four of the sequential evaluation process the administrative law judge found that Stines could not perform her past relevant semi-skilled to skilled, sedentary to light work as a help desk clerk, office manager, records keeper, crew chief and customer service person but that she had the residual functional capacity to perform a limited range of unskilled, light work(treated as sedentary). Tr. 16, 19 and 57. Specifically, the ALJ found that Stines could perform such work

> except she is reduced to 4 hours of standing/walking, occasional crawling, and climbing, but never on ladders, ropes or scaffolds. The claimant must avoid concentrated exposure to temperature extremes of cold/heat, humidity, wetness, fumes, odors, dusts, gases and poor ventilation. She has to avoid high loud noises (such as jackhammer noises), vibrations and hazards such as moving machinery and unprotected heights. She can do simple routine tasks, but no detailed or complex tasks. She should work in a low stress work environment defined as occasional decision making and occasional changes in a work setting, and have occasional interaction with the public, co-workers and supervisors.[29]

Tr. 16. In setting the residual functional capacity, the administrative law judge found that Stines's statements concerning the intensity, persistence and limiting effects of her impairments were not credible to the extent that they were inconsistent with her ability to engage in the work as described above. Tr. 18. The ALJ further relied on the opinion of Dr. Bianca and the other state agency physicians and psychologists who found that Stines could engage in a range of work and was not totally disabled. In fact the ALJ gave Stines the benefit of the doubt based on her testimony and imposed more limitations in the residual functional capacity assessment than were imposed by the consultative

---

29. The vocation expert testified that this residual functional capacity assessment which limited Stines to 4 hours of standing and walking would "eliminated light duty positions because you have to be able to stand six out of the eight hours - - stand or walk six out of the eight hours." Tr. 57.

examiners and the physicians and psychologists who reviewed Stines's medical records. Tr. 16-19.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five of the sequential evaluation process that Stines could perform work, inter alia, as a video surveillance monitor and addresser, and that there were a significant number of such jobs in the regional economy. Tr. 20.   The vocational expert identified those two positions as unskilled, sedentary duty work. Tr. 58-59.

The administrative record in this case is 1940 pages in length, primarily consisting of medical and vocational records.  Stines  argues that (1) the ALJ's residual functional capacity assessment is not credible as a matter of law, (2) the ALJ violated Social Security Ruling 12-2p relating to fibromyalgia, and (3) the ALJ failed to comply with Social Security Ruling 96-8p by finding that Stines could perform light work without discussing the requirements of such work including reaching and whether or not she could perform such work on a continuing basis.

We have thoroughly reviewed the record in this case and find no merit in Stines's arguments.  The administrative law judge did an adequate job of reviewing Stines's vocational history and medical records in his decision. Tr. 10-21.  Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 12,  Brief of Defendant.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is]

disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c).

No treating physician submitted a functional assessment of Stines which indicated that she was functionally impaired from a physical or mental standpoint for the requisite continuous 12 month period. The record does not contain any statement from a treating physician that Stines had physical or mental limitations that would preclude her from engaging in work as a video surveillance monitor or addresser and we cannot so conclude from a review of the bare medical records. There were multiple assessments regarding Stines's functional abilities from state agency physicians and psychologists in the record which the ALJ appropriately relied on in setting Stines's residual functional capacity. The administrative law judge's reliance on those opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Stines's second argument relating to the fibromyalgia Social Security Ruling is not a basis for remand because that ruling, SSR 12-2p, only became effective on July 25, 2012, well after the ALJ's decision. See, e.g., Money v. Barnhart, 91 F.App'x 210, 214 (3d Cir 2004) ("The district court correctly noted that the ALJ was not bound by [SSR 00-4p] when he rendered this decision in 1999 because [the Ruling] was not effective until December 2000."). In addition, in making her argument Stines references portions of SSR 12-2p relating to when fibromyalgia should be considered a medically determinable impairment, e.g., a history of widespread pain and repeated manifestations of six or more fibromyalgia symptoms. In this case, the ALJ found that Stines's fibromyalgia was

22

a severe medically determinable impairment.  Consequently, her argument based on SSR 12-2p is unavailing.  Also, Stines references her obesity as part of her second argument.  The ALJ addressed Stines obesity in her decision by finding that it was a severe medically determinable impairment.  Furthermore, he limited Stines to a range of work which although referred to as light work was in fact at the sedentary level.

Stines third argument in toto is that the ALJ "summarily concluded in her RFC that [she] can perform light work and failed to discuss other requirements of such work as reaching, as well as setting out whether [she] could perform the demands of light work on a regular and continuing basis in violations of [Social Security Ruling] 96-8p." For all the reasons set forth above this argument is without merit.  Furthermore, if Stines is arguing that the ALJ was obligated by SSR 96-8p to set forth a particular recitation of the facts in support of his residual functional capacity assessment the law is clear that no such specific format is necessary. See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 (3d Cir. 2000).

Finally, to the extent that Stines argues that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Stines's claims regarding her physical or mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531

(6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799,

801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally

positioned to observe and assess the witness credibility.").  Because the administrative

law judge observed and heard Stines testify, the administrative law judge is the one best

suited to assess her credibility.

We are satisfied that the administrative law judge appropriately took into

account all of Stines's mental and physical limitations in the residual functional capacity

assessment.

Our review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42

U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

Robert D. Mariani
United States District Judge


Date: August 28, 2014

24